*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

HENRY JERMAINE JOHNSON,

Defendant-Appellant.

UNPUBLISHED
April 14, 2025
10:49 AM

No. 364543
Macomb Circuit Court
LC No. 21-000928-FC

Before: YATES, P.J., and O'BRIEN and FEENEY, JJ.

PER CURIAM.

Defendant appeals as of right his jury-trial convictions of two counts of first-degree murder, MCL 750.316, under alternative theories of premeditated murder, MCL 750.316(1)(a), and felony murder, MCL 750.316(1)(b). Defendant appealed his convictions, arguing that his trial counsel was ineffective. This Court remanded the matter to the trial court for a *Ginther*[1] hearing.[2] After the hearing, the trial court denied defendant's motion, concluding that defendant's trial counsel's performance did not fall below an objective standard of reasonableness, which rendered it unnecessary to address whether counsel's performance prejudiced defendant. We hold that the trial court erred by concluding that the performance of defendant's trial counsel was not objectively unreasonable. We therefore reverse that portion of the trial court's post-trial order and remand for the trial court to consider whether the deficient performance of defendant's trial counsel prejudiced defendant.

## I. BACKGROUND

This case arises out of the deaths of the victims, Tina Lynn Geiger and her 11-year-old daughter, KG. The victims lived together at the Parkway Village Apartments. On July 30, 2013, Frank Worden, a Parkway Village maintenance employee, performed a wellness check on the

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[2] *People v Johnson*, unpublished order of the Court of Appeals, entered July 2, 2024 (Docket No. 364543).

victims' apartment and found the victims deceased. The victims had multiple stab wounds, and KG had injuries consistent with sexual assault. Police found a suspected print on a closet door in KG's bedroom, and identified two spots of suspected dried blood outside the victims' apartment in the communal stairwell of the apartment building. Police took swabs of the blood and from under KG's fingernails to test for DNA.

The case remained cold for several years until, in August 2020, the print from KG's closet door was matched to defendant's brother, Tony Johnson. Upon further investigation, it was discovered that the haplotype profile found under KG's fingernails matched Tony's haplotype profile. As explained at defendant's trial, male relatives share the same haplotype profiles, so if two brothers "share the same father, the father and the two brothers will have the same haplotype" profile. Because defendant and Tony share the same father, the haplotype profile found under KG's fingernails also matched defendant's haplotype profile. Officers also compared defendant's DNA to the DNA profile of the blood found in the communal stairwell and concluded that "it was at least 35 septillion times more likely that" the DNA found in the hallway came from defendant "than if it originated from an unrelated, unknown contributor." Although the haplotype profile of the blood in the hallway matched Tony's haplotype, further testing excluded Tony as the source of the DNA in the hallway.

The cases against defendant and Tony were consolidated for trial. The prosecution presented as evidence security footage taken from a 7-Eleven showing the victims in the store in late-evening hours of July 23, 2013, and into the early-morning hours of July 24, 2013. The footage also showed defendant and Tony in the store interacting with the victims. Aaron Cushard, who was working at the 7-Eleven at the time, testified that he saw the victims leave with the two men, which was confirmed by the footage. Pamela Mitchell, the victims' neighbor, testified that she that spoke to Tina almost every day and had no contact with her after July 23, 2013. The prosecution also provided evidence that Tina made no outgoing calls after July 23, 2013. In an effort to rebut the prosecution's timeline, the defense presented Samantha Bell, who testified that she saw the victims the Thursday before their bodies were discovered (meaning she saw them on July 25, 2013), but Bell also admitted that she had a brain injury that impacted her memory. In its closing, the prosecution relied heavily on the 7-Eleven video and asserted that the victims were last seen alive leaving the 7-Eleven with defendant and Tony. It further urged the jury to discount Bell's testimony due to her admitted memory issues. The jury found defendant guilty as stated above.

Once in this Court, defendant moved for an evidentiary hearing to determine whether defendant's trial counsel was ineffective for failing to call witnesses at trial who saw the victims alive after they were seen leaving the 7-Eleven with defendant. Defendant argued that his trial counsel knew or should have known (because it was in discovery materials) that three witnesses—Anderia Douglas, Terris Walker, and Regina Kendle—told police that they saw the victims alive after the victims were seen leaving 7-Eleven with defendant, and asked for an evidentiary hearing to question defendant's trial counsel as to why he did not call these witnesses. In support of his motion, defendant attached affidavits signed by Douglas and Walker averring that each of them saw Tina alive after she and KG left the 7-Eleven in the early-morning hours of July 24, 2013. This Court granted the motion.

At the ensuing *Ginther* hearing, defendant's trial counsel, Josh Jones, testified that he hired an investigator, Brittany Piotrowski, to interview the witnesses listed in the police report he

received as part of discovery for this case. Jones estimated that there were between 20 and 30 witnesses listed in the police report, but he did not tell Piotrowski to prioritize any particular witness. Jones explained that, because the relevant events took place so long before he got the case, he mostly wanted Piotrowski to contact the witnesses and "verify" the statements they gave to the police. Jones did not know what steps or methods that Piotrowski used to contact the witnesses in this case, though he was generally familiar with Piotrowski's process of using multiple methods to contact witnesses, including calling witnesses, texting them, and reaching out to them via social media. He explained, however, that he did not "get involved in" the specifics of what Piotrowski did because he trusted Piotrowski "with doing her job." Jones added that he had a "working relationship" with Piotrowski, and that they had an understanding that Piotrowski would request more time to reach a witness if she thought that would make a difference. "I trusted her discretion," Jones said.

As for defendant's trial, Jones acknowledged that one of the defense's trial strategies was to attack the prosecution's timeline, and to do that, Jones called Bell as a witness. Jones conceded that he was not aware of Bell's memory issues when he called her as a witness, and he thought that those memory issues likely affected the strength of her testimony. Jones also conceded that he was aware that witnesses besides Bell had seen the victims alive after the 7-Eleven footage was captured, but Jones did not call those witnesses to testify because Piotrowski was unable to contact them. On cross-examination, Jones testified that the defense's "primary focus" was the DNA evidence, not the prosecution's timeline. Jones also thought that the 7-Eleven footage was not particularly strong evidence because it was circumstantial and did not place defendant with the victims when they died—the footage only showed defendant walking away with the victims, and Jones thought it was "a huge stretch" to use that footage to tie defendant to the murders.

Piotrowski testified that she was hired to "attempt to locate . . . and interview" the witnesses identified in the discovery material provided to Jones. Piotrowski said that she did not prioritize any one witness over another because it was "not really [her] place to prioritize witnesses." Instead, she simply tried to interview the witnesses identified in the discovery materials to corroborate what they said in their statements to the police, and to determine whether the witnesses knew other information that could be relevant to defendant's case. Piotrowski admitted that she only tried to call potential witnesses; when asked if she took "any steps to try to contact witnesses other than calling them," Piotrowski said that she "did not." Piotrowski clarified that she did not send text messages or emails to any of the witnesses, nor did she try to reach out to any witness via social media. She also did not try to go to any witness's home to try to contact them because that would be "field work," and funds were not appropriated for her to conduct field work in this case. Piotrowski testified that she was unable to get into contact with Douglas, Walker, or Kendle during her investigation of this case.[3]

Following the evidentiary hearing, supplemental briefing, and closing arguments, the trial court issued a written opinion and order denying defendant's motion for a new trial. The court concluded that Jones's performance did not fall below an objective standard of reasonableness

---

[3] Following the testimony of Jones and Piotrowski, Douglas and Walker testified at the evidentiary hearing, and they each described the last time that they saw the victims alive, which was after the 7-Eleven footage was captured. Kendle did not testify because she passed away in February 2024.

because he tried to contact Douglas, Walker, and Kendle but was unsuccessful. The court distinguished this case from cases in which trial counsel failed to consult a key witness—counsel here, the court explained, tried to consult the witnesses but was simply unsuccessful. The court additionally reasoned that this case was not a simple credibility contest, and the defense's focus was on rebutting the DNA evidence linking defendant to the crime scene. This, in the court's opinion, made defense counsel's decision to not try harder to reach witnesses who could dispute the prosecution's timeline more reasonable. "Because Mr. Jones had battles to fight on a number of different fronts, it could have been reasonable trial strategy for him to trust that Ms. Piotrowski diligently attempted to contact the witnesses and determine that his limited time and efforts would be better spent elsewhere," the court explained. Given its conclusion that Jones's performance was not objectively unreasonable, the trial court declined to address whether defendant was prejudiced by Jones's performance.

The case now returns to this Court for plenary review.

## II. STANDARD OF REVIEW

Whether a criminal defendant was denied the effective assistance of counsel presents "a mixed question of fact and law—the trial court's factual findings supporting its decision are reviewed for clear error, while the court's determination of whether those facts violated the defendant's right to the effective assistance of counsel is reviewed de novo." *People v Haynes*, 338 Mich App 392, 429; 980 NW2d 66 (2021). A finding is clearly erroneous if the reviewing court is left with a firm and definite conviction that a mistake was made. *People v Isrow*, 339 Mich App 522, 531; 984 NW2d 528 (2021).

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

To establish a claim of ineffective assistance, "a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). It is presumed that counsel's performance was "born from a sound trial strategy," and reviewing courts must be careful to not substitute their judgment for that of counsel or assess counsel's decisions with the benefit of hindsight. *People v White*, 331 Mich App 144, 149; 951 NW2d 106 (2020) (quotation marks and citation omitted). At the same time, reviewing courts must be mindful to not "insulate the review of counsel's performance by calling it trial strategy." *Trakhtenberg*, 493 Mich at 52. Only when a strategy is in fact sound does it support that counsel's performance was reasonable. *People v Douglas*, 496 Mich 557, 585; 852 NW2d 587 (2014).

Generally, decisions about which witnesses to call are "presumed to be matters of trial strategy." *People v Putman*, 309 Mich App 240, 248; 870 NW2d 593 (2015). But, like any trial strategy, a decision about which witnesses to call is only sound trial strategy if it was "developed in concert with an investigation that is adequately supported by reasonable professional judgments." *People v Grant*, 470 Mich 477, 486; 684 NW2d 686 (2004). Trial counsel always has a duty to make a reasonable investigation, "and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland v Washington*, 466 US 668, 690-691; 104 S Ct 2052; 80 L Ed 2d 674 (1984). See also *Trakhtenberg*, 493 Mich at 52.

Defendant does not argue that Jones's failure to call Douglas, Walker, or Kendle as witnesses was objectively unreasonable when viewed in isolation. As the prosecution argues, that decision standing by itself was likely reasonable because Jones was unable to get in contact with those witnesses, so he did not know whether their testimony would be helpful for defendant's defense. While it is true that Jones knew what the witnesses told police, and Jones could impeach any of the witnesses if they denied making their previous statements, Jones explained at the *Ginther* hearing that he worried how such an interaction would play for the jury. That is a fair and legitimate concern, so standing alone, Jones's decision to not call Douglas, Walker, or Kendle as witnesses after not being able to contact them was reasonable.

Defendant's argument is more nuanced, though—he contends that Jones's failure to get into contact with the witnesses was, itself, unreasonable, so it could not support his failure to call Douglas, Walker, and Kendle as witnesses. This is a closer question, and on balance, we agree with defendant.

Jones had a duty to conduct a reasonable investigation, and any limit on that investigation had to be supported by reasonable professional judgment. *Strickland*, 466 US at 690-691; *Trakhtenberg*, 493 Mich at 52. As will be explained, we conclude that Jones did not satisfy his duty to conduct a reasonable investigation, and the limits on his investigation were not supported by reasonable professional judgment, due to the confluence of two interrelated considerations.

First, as Jones testified, he asked Piotrowski to interview between 20 and 30 witnesses but did not ask Piotrowski to prioritize any witnesses. The reason for this lack of direction is unclear. Jones said that he wanted Piotrowski to contact all of the witnesses identified in the discovery materials provided by the prosecution to "verify" the statements they gave to the police, but some of the statements that witnesses gave to police were decidedly more helpful to the defense than others. In particular, the statements that Douglas, Walker, and Kendle gave to police—which Jones was aware of because they were included in the discovery materials—helped rebut the prosecution's timeline of events. And Jones clearly understood that rebutting the prosecution's timeline was important because one of the two witnesses he called for the defense was Bell. But rather than instructing Piotrowski to make a concerted effort to contact Douglas, Walker, and Kendle to verify their statements to police, Jones instead gave Piotrowski a list of 20 to 30 witnesses then "trusted her discretion." This is problematic not only because Jones was responsible for defendant's defense but because Piotrowski believed that it was "not really [her] place to prioritize witnesses."

This bleeds into our second consideration—in part because Piotrowski was not given any direction on which witnesses to prioritize, her investigation was seemingly hampered. To begin, the lack of direction provided to Piotrowski led her to expend the same effort and resources trying to contact all of the 20 to 30 witnesses that Jones asked her to contact instead of focusing on witnesses who made statements helpful for defendant's defense. This is significant in part because Jones and Piotrowski both testified that the amount of work Piotrowski could do on this case was limited by funding constraints,[4] and Jones never explained why it was useful for the defense to

---

[4] Funding constraints never actually became an issue, however. Jones submitted three requests to fund Piotrowski's investigation, all of which were approved.

"verify" the statement of every witness listed in the discovery material. In other words, if funding was scarce, it is unclear why Jones believed it best to use the limited resources available to conduct a broad and directionless investigation instead of a targeted investigation into witnesses whose testimony could aid the defense based on what the witnesses told police.

That aside, Piotrowski's method of trying to contact the witnesses, itself, raises questions. Piotrowski admitted that she only tried to call potential witnesses; she did not try to reach out to the witnesses through text, email, or social media, nor did she attempt to go to a witness's home or place of work.[5] While this is perhaps understandable given the sheer number of witnesses that Piotrowski was tasked with contacting combined with the limited time she had to do so, it nevertheless raises concerns about the reasonableness of the investigation. This is particularly so because the investigator that defendant hired for his appeal *was* able to contact Douglas and Walker using "standard techniques"—reaching the witnesses by phone and going to their known addresses. The prosecution rightly points out that just because a different investigator was able to contact the witnesses does not mean that Piotrowski's investigation was unreasonable, but the point is not that another investigator was able to contact the witnesses but that she was able to do so using methods that Piotrowski admitted to using in other cases. Piotrowski simply did not use those techniques in this case, and it is unclear why such methods were not used to contact witnesses like Douglas, Walker, and Kendle, who Jones knew gave statements to police that would be useful to defendant's defense at trial.

The trial court reasoned that it was reasonable for Jones to trust that Piotrowski conducted a thorough investigation, and we agree to an extent. Jones could take Piotrowski's word that she tried but was unable to contact all of the witnesses, but we think that Jones could not wholly outsource his duty to conduct a reasonable investigation. When Piotrowski told Jones that she was unable to contact witnesses—particularly witnesses like Douglas, Walker, and Kendle, who Jones knew or should have known had made statements to the police that could aid defendant's defense—Jones accepted this as fact and moved on. He did not ask Piotrowski basic questions like what methods she used to try to contact the potential witnesses or whether Piotrowski thought she could contact important witnesses if given more time or resources. This strikes us as problematic in the context of this case, and we simply cannot agree with the trial court that Jones satisfied his duty to conduct a reasonable investigation by hiring an investigator to contact 20 to 30 witnesses without further instruction or follow-up, especially not when Jones knew or should have known that specific witnesses on that list made statements to police that would aid in defendant's defense at trial.

Ultimately, the dynamic between Jones and Piotrowski created something of a feedback loop—Jones failed to provide useful direction for Piotrowski's investigation into the list of 20 to 30 witnesses that Jones gave her, which led Piotrowski to conduct a cursory investigation into all of the witnesses instead of a targeted investigation into witnesses who could aid the defense, and then Jones relied on Piotrowski's cursory investigation to make decisions about how to proceed at

---

[5] Presumably, when Piotrowski called witnesses and they did not answer, she left a voicemail explaining the reason for her call and how she could be contacted, but Piotrowski never testified to this at the evidentiary hearing. No party raises an issue with this, however, and whether Piotrowski left voicemails does not factor into our conclusion.

trial. The prosecution on appeal argues that this feedback loop rendered Jones's performance objectively reasonable; the prosecution contends that Jones's decision to not call Douglas, Walker, and Kendle was reasonable because it was based on Piotrowski's investigation, and Piotrowski's investigation was reasonable because she followed Jones's instructions. The fundamental problem with this framing, in our estimation, is that to accept it would absolve Jones of his duty to make a reasonable investigation. The prosecution is correct insofar as Piotrowski's investigation followed Jones's instructions, but we think that supports our conclusion—Jones failed to reasonably investigate Douglas, Walker, and Kendle as potential witnesses for defendant's defense.

With this framing, we return to the question of whether it was reasonable for Jones to not call Douglas, Walker, and Kendle as witness. Again, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 US at 690-691. Reasonable professional judgment did not support the limit on Jones's investigation into Douglas, Walker, and Kendle. Jones apparently was not even aware of how limited the investigation into these witnesses was because, despite knowing of their favorable statements to police, Jones never asked Piotrowski how she tried to contact them. We therefore conclude that Jones did not reasonably investigate Douglas, Walker, and Kendle as potential witnesses, and his failure to satisfy this duty was not based on "a reasonable decision that [made the] particular investigation[] unnecessary." *Trakhtenberg*, 493 Mich at 52 (quotation marks and citation omitted). This in turn undermines the reason Jones gave for not calling Douglas, Walker, and Kendle as witnesses. Jones explained that he did not call Douglas, Walker, and Kendle as witnesses because he was unable to get into contact with them, but the the reason that Jones was unable to get into contact with them was because he failed to reasonably investigate them as witnesses.

We further conclude that Jones's failure to adequately investigate Douglas, Walker, and Kendle rendered Jones's performance objectively unreasonable because the testimonies of Douglas, Walker, and Kendle clearly would have aided defendant's defense, and there was no strategic reason to not call them as witnesses. The prosecution presented evidence suggesting that the victims were not seen or heard from after the early morning hours of July 24, 2013, when they were seen walking home from the 7-Eleven with defendant and Tony. The prosecution presented testimony from Mitchell, who stated that she spoke to Tina almost every day and last heard from her on July 23, 2013. The prosecution also presented testimony from Cushard, the 7-Eleven clerk, who said that the victims were regular customers, and he did not see them after July 24, 2013. And the prosecution presented Tina's cell phone records, showing that she did not make any outgoing calls after July 23, 2013, and all incoming calls likely went to voicemail. It was in this context that the prosecution showed the jury video of the victims leaving 7-Eleven with defendant in the early morning hours of July 24, 2013, to argue that defendant was with the victims when they were last seen alive.

The testimony of Walker, Douglas, and Kendle would have challenged this timeline by presenting evidence that the victims were seen alive in the days after they left the 7-Eleven with defendant. While the defense called Bell to dispute the prosecution's timeline, Jones candidly admitted that, if Walker, Douglas, and Kendle confirmed the statements they made to police and were willing to testify, he would have called them as witnesses. This is eminently reasonable, as four witnesses who saw the victims after they left the 7-Eleven with defendant would have been more convincing than one witness, especially one witness who admitted to having memory issues.

-7-

We also believe that adequately rebutting the prosecution's timeline was of particular importance because the prosecution's case was built on mostly circumstantial evidence. The trial court correctly noted that this case was not a credibility contest, and while that is relevant in some cases, we do not think it is relevant here. The prosecution's case hinged not on a witness's credibility but on the jury agreeing with the prosecution's interpretation of the evidence. The only evidence explicitly tying defendant to the victims was the footage from 7-Eleven. Defendant's DNA was found in the communal stairwell outside the victims' apartment, not inside the apartment itself.[6] And the haplotype profile found under KG's fingernails tied Tony to the victims just as much as it did defendant. In fact, the haplotype profile's connection to defendant was arguably diminished by the fact that Tony's print was found in KG's bedroom.

On a similar note, convincing the jury that the prosecution's timeline was incorrect would lessen the impact of the DNA evidence, which Jones testified was the defense's "primary focus." Finding defendant's DNA in the stairwell outside the victims' apartment is highly suspect if the victims were last seen alive leaving 7-Eleven with defendant. But if defendant walked the victims home from 7-Eleven and they were seen alive afterwards, finding defendant's DNA outside the victims' apartment is far less suggestive that defendant was involved in the murders.

Accordingly, given the obvious benefit that the testimonies of Douglas, Walker, and Kendle could have had, we conclude that it was objectively unreasonable for Jones to not adequately investigate them as witnesses and consequently fail to procure their testimonies at defendant's trial.

Because the trial court concluded that Jones's performance was objectively reasonable, it declined to address whether Jones's performance prejudiced defendant. We therefore remand for the trial court to address that issue in light of our conclusion that Jones's representation of defendant fell below an objective standard of reasonableness.

## IV.  CONCLUSION

For the reasons explained in this opinion, Jones's performance fell below an objective standard of reasonableness. We therefore reverse that portion of the trial court's order and remand for the trial court to address whether Jones's unreasonable performance prejudiced defendant. We do not retain jurisdiction.

/s/ Christopher P. Yates
/s/ Colleen A. O'Brien
/s/ Kathleen A. Feeney

---

[6] The victims' neighbor, Mitchell, testified that she had met defendant through her daughters, and her daughters and defendant would hang out "in the hallway as a group."

-8-